The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. We'll begin with Higgins v. Wilson Air and Mr. Bryant. May it please the Court, I'm Attorney Ralph Bryant, Jr. This case arises out of the Western District of North Carolina. We are here on appeal of a summary judgment order in on December 1st, 2023 by the Honorable Judge Conrad. The nature of this case is it is a form of discrimination case. My client alleges that the defendant, Wilson Air, discriminated against her because of her disability. She is a cancer survivor and as I'll talk to you about in just a second, she's survived a double mastectomy. The facts of this case center around about a 36-day period of time from May 11th, 2021 to June 17th, 2021. Leading up to May 11th, 2021, my client started working for Wilson Air and she'd been working in 2005. She'd been working there about 16 years. During COVID, about March 20, when COVID was around that period of time, she was diagnosed with cancer about a year before this May 11th period of time. She was diagnosed with cancer. COVID came along and because of COVID, they had her working remotely from home. She worked from home first because of COVID and then she had a double mastectomy in September 2020. She continued to work from home. Then in January, she had to have some chemotherapy infusion treatments. She continued to work from home. During this entire period of time, she actually performed all the duties of her position. She was able to perform them remotely. And then on May 11th, I think we're fairly familiar with the facts, so I wanted to skip ahead to a question about the facts. On May 11th, she and her employer had a meeting in which it appears she agreed to a reasonable accommodation. And did she not then reject that by failing to abide by it on the 17th? Reasonable accommodation being that she would start Monday at 7 and that Monday would be May 17 and see where it goes. And she responded, okay. In fact, they suggested that she could be in the office one day a week to get the work done that she needed to get done in the office. And she said, I can do it twice a week. So how did she not reject that reasonable accommodation? So what happened, they had the meeting May 11th. They're doing the May 11th meeting. They agreed that the reasonable accommodation would be that she could perform the duties of the position from home and some of the duties there at work. On May 12th, the next day, she contacted the human resources person for Wilson Air and said, they're demanding that I come in. I'm not sure what my doctor is going to say about this. I've got to talk to my doctor. And she got a note from her doctor that came in May 17th saying that the doctor wanted her to continue to work from home because of her compromised nature. But she didn't tell them all that at the meeting that they had on May 11th, right? Two things. She told them that she would have to talk to her doctor. And she told them that her health and her life was most important. And when she left, she told them, I will talk to my doctor and I will get back with you. But other things aside, if the doctor does not object to it, I will be here on the 17th. The thing is, on the 12th, she continued to engage in protected activity when she contacted the HR person. Your opponent suggests that between May 11th and June 18th, she only worked in person two partial days total. Now, that's a very minimal period of time. And the opposing counsel has listed all kinds of events, all kinds of tasks that needed to be performed in the office. But you only came to the office in over a month for two partial days. And yet, there are all these tasks that must be performed in the office. And so, your client is a no-show. And don't we have some law indicating that if you're a no-show, essentially, you're not a qualified employee? Your Honor, and so, the facts, the audio recording, the transcribed audio recording, clearly shows that she was performing all of the duties of a position. The people that worked there clearly reached the conclusion, you are performing all of the duties. The payables that the opposing counsel talked about, they talked about it in there. But to follow up on what Judge Thacker said, this is a company, this is not a company. This is not a really harsh employer. They tried to offer one reasonable accommodation after another. At first, it seemed that those were accepted. But then, as the performance played out, they were, in actuality, they were rejected. But the company here is searching for reasonable accommodations here. And nothing ever seems to work. And it's compounded by the fact that they're having a great deal of difficulty finding out why she was a no-show. There was not the kind of communication that one would expect from someone when they're absent from work. They make calls and everything. So what you're dealing with here is a company that tries a variety of reasonable accommodations. They don't work. The individual doesn't show up for work. The individual doesn't communicate properly why she didn't show up for work. We have precedent saying that, and of course, one has to be qualified employee. We have precedent saying that if you're a no-show, you're not a qualified employee. And so, I don't understand what Judge Conrad did wrong here, given this record. Yeah, Your Honor. So when you look at what actually occurred, on the 12th, after the meeting, on the 12th, when she spoke to the human resources officer, she was engaging more in her right to protected activity to say, hey, my doctor may not allow me to return to work. And she got a note from her doctor on this. I don't think anybody really contests that, that she was in protected activity most, if not all the time, along the way. And I'm very sympathetic to her client. I'm a cancer survivor, so I can understand that. But this really strikes me as a case almost of no good deed goes unpunished. It seems like this is an employer who went out of its way, in a lot of different ways, to accommodate the claimant. And I think your burden is to explain why all of the times where the claimant didn't show up, she didn't answer phone calls, she didn't answer emails, why that doesn't entitle the employer to terminate the employment. Thank you, thank you. So, May 17th, when she didn't show up, she did not show up because she was waiting to hear back from the HR person. She specifically told her, look, I'm going to talk to Vince, I'm going to talk to Vince Patkey, who is the general manager, and I will get back with you. When the HR person called her again, it was May 25th, the next week, and she said to her, you have to be at work the next day. And the next day, even though she had two medical appointments, my client actually went to work the next day, that was the 26th. On the 27th, which was a Thursday, they understood that she always had that chemotherapy infusion, every third Thursday, so she went to chemotherapy like they all agreed. Friday, she didn't work because of an agreement they reached during COVID. Saturday and Sunday, Monday was a holiday, the 31st. The next day she could possibly work was actually June 1st, and she showed up on June 1st. And actually worked that day, even though while she was working, the expander broke and she had fluid coming out of her shirt. She actually finished the day. The next day she had a medical appointment, and during the medical appointment, the doctor, doctor, that's when the doctor said, I'm going to put you in emergency surgery the next day. And the doctor sent the employer a note telling them she would be out of work from June 3rd until June 17th. And they fired her on June 17th. I don't know so much if it's the out of work, but it's the failure to communicate, because she would get emails or phone calls from the folks at Wilson Air and just didn't communicate back to them. She may have had some misunderstanding, but what's the employer to do in that circumstance? They're trying and trying to communicate. They're trying to accommodate, and they don't get anything. So what happened is she did communicate on the 4th. She spoke to, she communicated with the general manager, Mr. Papke, who asked her about the  She told him it went well. On June the 6th, she talked to her. She communicated with her supervisor. He sent her a confirming text message on the 7th, and she said, look, the doctor wants me to be out for the surgery. I'm going to take my leave since you're not going to let me work. I'm going to take my leave until I get an opportunity to come back. She did communicate that directly with her supervisor. What you were hearing about from defense counsel is that they took her work laptop. So instead of them being able to communicate through MS Teams like they've done for years, now her supervisor texts her cell phone. The general manager texts her cell phone. These two ladies, Ms. Case and Ms. Bond, they start sending something to her private email that she wasn't checking for things from them because she had already given them a note that she was going to be out until the 17th. It wasn't a thing of her not communicating. She clearly communicated with everybody. It's just this one issue with these two ladies who kept trying to, while they had a note, they kept trying to get at her about you not coming to work. So it sounds like your argument, at least with regard to this part of the case, might be that since this is a summary judgment dismissal, there is a genuine issue of material fact as to this communication issue. Yes, ma'am. That is the issue of this appeal, is that a jury should decide this. There are a lot of things. For instance, when I took Ms. Emily Case's deposition, there was a certain amount of tenseness, a certain amount of aggravation in her voice that if a jury could hear, they could say, well, why are you so aggravated with this lady who had breast cancer trying to come back and forth to work? Those are the things that I think that a jury is entitled to make decisions about. And that's what we're asking, that you return it and allow a jury to make those decisions. And then the defendant, even when they're talking about the dismissal of certain claims, they're saying she's not a qualified individual. She certainly is. And they have not said anything about undue hardship. The recent Supreme Court case says, look, if you're going to say that you cannot accommodate them, then you have to move forward with some sort of undue hardship. They have not once even talked about any type of undue hardship. In fact, they really can't because they transcribed the meeting and the words of the meeting really control. And during the meeting, over and over, her supervisor said she is doing everything that we need done. Let me ask you about this testimony from Bond about an email, and she's communicating to Ms. Higgins, I sent you an email on Tuesday the 8th because you did not show up for work and we did not hear from you. We knew you were going to be out of work on the 7th, but we did not have any notice that you would be out for multiple days. We just received a note from your doctor saying you need to be out until next Thursday. When you expect to miss multiple days, you need to let us know in advance. Please contact me on Wednesday next week so that we can plan for your return. And then the district court concluded again. Higgins answered with silence. Is there any factual dispute about any of that? Yes, Your Honor. All right. What is it? It's that on June 6th and 7th, she communicated with her supervisor and advised her supervisor that she would be out of work. The other issue is this communication is communication through a private, they had taken her laptop. And so when they used to communicate through MS Teams up until that moment on June 2nd when they took her laptop, they always communicated through MS Teams. Now they start communicating through a private email that she's going through chemotherapy and she's going through surgery. She's not checking her private email every day. She had already talked to her supervisor, John Cox, and he knew she was going to be out. Well, that's not really a factual dispute. It sounds more to me like that's some sort of a defense that you would offer. That, yes, Your Honor. Okay. So what the defendant is saying is that the defendant is saying that these two ladies communicated with her, communicated, communicated with her. And my position is they didn't. And they knew they weren't communicating with her. And that statement that she made that in that letter, in the email that my client had not communicated with, they knew it was false because it was false because she communicated with the supervisor. And it's a situation where these two ladies got upset with my client. And when you say she communicated with her supervisor, you're talking about the June 6th text? Yes, ma'am. June 6th and June 7th when he replied. And so the issue is that these two ladies acting on her behalf decided to terminate my client. There is not in there an affidavit or deposition testimony from John Cox, the supervisor. Everything you know about John Cox from John Cox, the supervisor, says in that May 11 meeting, oh, yes, she does that already. Payable, she does that already. Yeah, we can get it done. We can get it done. Nothing that amounts to termination. And why would you terminate a lady, excuse me, why would you terminate, I guess I need to get my time, why would you terminate someone who actually has given you a doctor's note to cover those days and on top of that still has sick leave and personal leave? When did the doctor's note come in? Doctor's note came in, I think, on the 10th. Right, okay. And she said, in the deposition, she said, look, I had the doctor's note. I knew those days were covered from the 3rd to the 17th. When I, you know, when we terminated her, we knew those days were covered. All right. Thank you, counsel. Thank you, Your Honor. Mr. Das. Good morning, Your Honors. May it please the court. My name is Proloi K. Das. I'm joined by my law partner, Frank L. Day. We're attorneys at the law firm of Fort Harrison. We're here today on behalf of the defendant, Appelli Wilson-Eyre. Your Honors, as a legal matter, I think I'd like you to start with qualified individual because I think that's dispositive of both the discrimination and accommodation claims. And the reason for that is when someone brings an ADA claim. Can you get that microphone as close as possible to you? When a plaintiff brings an ADA claim, they need to show that they're a qualified individual who can perform the essential functions of the job of the specific employment position at issue. Here, we're talking about the accounting assistant position. Now, the question about whether what are essential functions for a particular position is not an objective question. It's a question for the employer to determine. And the employer determines that from the very first job description. So what happens here is you have the employer determining that this job requires individuals to be in-person because the way this particular employer processes their payables requires that in-person presence. And on pages 11 through 13 of our brief, we've set that process out. Now, so once that becomes an essential function, in order for an ADA claim to be brought, the plaintiff has to be capable of fulfilling those essential functions. The starting point for that is the job description under both our regulations and our case law and I refer the court on page 19 of our brief to Hanna B. UPS. The job description here is exhibit 10 of our summary judgment papers. It's in our joint appendix at 249. Within that job description, it makes it very clear that the position of accounting assistant has to maintain the paper files, has to maintain the files for the payables, has to process the checks. All the processes that the judge found to be necessary for in-person presence on page two of his decision, on page nine of his decision, are things that require the individual to be in-person. Now, the ADA doesn't require that the employer change those essential functions. So in this case, when the employer determined that the essential functions required the individual to be in-person, if the plaintiff concedes that they're not able to do that, then they can't bring an ADA claim. That's what the judge determined here. If you look at page 10 of the decision, footnote one, it summarizes all those cases, both in the Fourth Circuit and other circuits, that that is the law. So once an individual can't satisfy those essential functions, the ADA simply does not apply. On that basis, that resolves both the discrimination claim and the accommodation claim because there simply is no ADA claim available. Now, the judge went a little further here, and the alternative noted that not only the plaintiff not show that she could satisfy the essential functions of the job, also could not show causation. Because, again, the burden on the plaintiff is to show that there is causation between the adverse action and discrimination. And that's not what we have here. The judge noted there's no direct or indirect evidence presented with respect to that. It's not enough just to challenge and claim that you disagree with the rationale the employer provides. They have to show causation in order to establish a prima facie case. Now, like I said, it's not particularly relevant to resolving the first two claims, accommodation and discrimination claims, because, again, those get resolved on qualified individual. But they are relevant to the retaliation claim because, although I think the case law is clear that once they can establish that the plaintiff could fulfill all the essential functions of the job, they can't fit within the ADA, that doesn't resolve the retaliation claim. But the causation issue does. For purposes of causation, the plaintiff had to show that there was a direct nexus between the adverse action and a claim of retaliation for exercising protected activity. And, again, as the judge noted here, there's simply no evidence direct or indirect to establish that. So I think that's probably the most straightforward way to resolve this case. I think the most important... So opposing counsel makes the point with regard to pretext that there's a factual dispute to be resolved over the plaintiff's failure to communicate. And he, as I understand the argument, says that she communicated on one date and then received various messages on her private email or private cell phone text, and that because of that, there's a factual dispute over that issue. What's your response to that argument? So I think I'll go back to what the trial judge says. That's what I understand the argument. And I agree. They're trying to create a factual question about whether the individual was being disciplined. But that's not what happened here. And the judge said that's not an accurate representation of the reason for termination. And this is why I think, consistent with the first part of the analysis, the reason the couldn't complete the essential functions of the job which required the individual to be in the office. That's evidenced by the fact that there was no communication. There were three consecutive days of absences. But all of that goes to the motivation being this individual could not complete the essential functions of the job which required her to be in person. Once that was established, then as a matter of law, the claim fails. Now, if the plaintiff could show that there was some kind of motivation that was pretextual, and the rationale for being terminated was not because of the inability to perform the essential functions, but rather just the mere absences and lack of communication. If that's what all this was, possibly. I still think the judge read it reasonably and said, I don't see a reasonable dispute of material fact. But the simplest way to resolve this, consistent, I think this is why the judge started with essential function, is to say, this job required an individual to be in person. And the individual here did not come in person. And court, as a court, no courts are allowed to question the employer's determination of essential function because it interrupts the employer's business judgment. And that's why we don't invade what the employer determines is necessary. In this case, when she was unable to come to work, to do the job in person, which is what this particular employer requires for payable processing, there's simply no basis, has every right to terminate that employee, and there's simply no violation either of the ADA or retaliation. The employer here, the record is replete with examples where the employer is trying to make things work. There's been one accommodation after another that was suggested. And simply, most of the accommodations revolved around the idea that you can come in for a limited time as long as you come in for, as long as you're there some of the time. And so these hybrid situations were suggested by the employer, which involved a combination of in-person work and remote work. And suggestion after suggestion was made. But none of these things worked out. But it isn't for an employer's lack of trying. They tried to make it work. And they were confronted with a difficult situation. As Judge Thacker pointed out, certain accommodations appeared to have been accepted, and then they weren't in practice. And it boils down, it seems to me, to a simple thing, and that is that you have to be at work, if not full time, a decent percentage of the time in order to do, and it's not just dealing with the accounts receivable. There are other tasks that needed to be performed in person. And despite the employer's best efforts, those qualifications were not met. And under our case law, you have to, in order to establish a Rehabilitation Act claim, you have to be qualified. And that basic threshold was not crossed. She just wasn't able to come, or she did not come to work. And it was critical. As I was saying, it's not only dealing with the accounts receivable in the office. She had to take mail invoices. She had to print purchase orders. She had to collate paper checks. She had to prepare envelopes in mail. She had to file different payment packets. But there are a whole string of, a whole string of tasks that the employer determined were necessary for at least some time in the office. And they tried to make it, they tried to make a go of it. And it just, it never got off the ground. But it wasn't for lack of trying. This is not a, this is not a harsh defendant. The record suggests plainly that this was anything but a harsh defendant. Yes, Judge Wilkinson, I agree with you. The employer tried to make a reasonable accommodation to perform the essential function of the job that was not, you know, complied with. And one thing, I think what they're trying to argue is that the employer should have just eliminated the essential function. But on page 18 of our brief, you'll see that's not the law. The employer here tried to make a reasonable accommodation so she could complete the essential functions and the employee either was incapable or unwilling to do that. And I think that's the reason the judge rejected the plaintiff's claims. I'm happy to answer any additional questions. Otherwise, we just ask that the decision below be affirmed. We don't have any questions. Thank you, Your Honor. Mr. Bryant, you've got some rebuttal time. Mr. Bryant, why don't you give us what you think is your best example of what you consider a material dispute of fact that would bar summary judgment here? What do you think is your best argument here? Yes, sir. The transcript from the May 11th hearing, the defense counsel talks about the job description and all this other stuff. But in reality, the question is what were the actual job duties and was she able to perform the essential duties of the job? You mean the May 11th meeting? Yes. Yeah. You said May 11th hearing. That confused me for a second. But okay. And then on page seven of the brief, it's John Cox who, again, there's no affidavit or deposition testimony from John Cox that says she could not do this position. And he says, we were talking about what exactly. So basically, everything. I thought other people in the office, at least during COVID, picked up some of these duties, that they had extra duties because of this. And that's not what they testified to. That's not what they talked about during this May 11th meeting. But Mr. Cox did cover some of the extra duties, right? That is what the defendant is saying. Well, who did the work when she was working remotely? There was some work that needed to be done in the office. Who did it when she was remote? I cannot really agree with that statement because- But appellant agreed that some work needed to be performed in the office. Going to the transcript that you're talking about at the May 11th meeting, it appears to me that appellant agreed that some things, like the filing, would need to be performed in the office. And that she said she could do that twice a week. Yes, Your Honor. And John Cox also- And that's at JA-211. John Cox also said, you've done that before. I'll get somebody to do that. Right. So that goes to what Judge Agee said, that they were getting other people to cover some of her work when she was out. So we're talking about the essential functions of the position as an accounting assistant you know, versus every possible thing that they had in the job description and essential functions, I think they- And you're saying that filing is not an essential function of that? Yes, ma'am. In their meeting, they talk about filing was not an essential function of it. And what JA site should I look to for that? JA-211. Oh. And then JA-215, JA-307. And again, I'm on page seven or eight of my brief. And I do want to mention that during the hearing, opposing counsel admitted that they transferred all these duties to Memphis, Tennessee from Charlotte. So the duties she was doing, they didn't hire somebody to do those duties. They transferred them to Memphis, Tennessee. And if they have to be done in person, as they say, the essential function has to be done in person. How can it be done from Memphis, Tennessee? And those are the things that a jury has to take into consideration when they're talking about, you know, they had to have an office because of productivity. Well, they didn't hire anybody to replace her. And the person that they say they did hire, they hired them part time. And they took a laptop from her. So productivity cannot really be- productivity has to be a pretextual reason. I think any jury would look at that and say, hey, this doesn't make any sense. You're saying you need her to be in the office because of productivity reasons. You're taking a laptop so she can't do anything now. How does that make any sense? Well, Mr. Bryan, just to go back one step. You've given Judge Thacker the site of JA-211. I believe Ms. Higgins is saying, I don't have a problem with filing, but I'll have to be here to do that part. Then John Cox says, well, you have done it before. We can get somebody to do that. Yeah, but like the payables and stuff, that's easy. It's usually once a week. I can do it twice a week. And then if you'll see throughout there, John Cox, it says- John Cox says retail payables, filing international files. She said, I already do that. And John Cox says, yes, she already does that. And throughout this- throughout their meeting, if you look at their meeting as opposed to this job description, look at their meeting, it's clear that she was performing the essential functions of the position. And I will say, if I can, before I go- All right. And she says that she has to be in the office to do the filing and that she can do it twice a week. Yes, ma'am. Yes, ma'am. I mean, she agreed to that. The thing, I think, part of what's being lost is the fact that the only reason she was not in the office was because of a medical reason. And she had sick leave and she had a personal leave to cover that. Thank you, Your Honor. Thank you. Thank you, counsel. We'll come down and recounsel and move into our second case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Stephanie D. Thacker